FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2014 JAN -6 PM 3: 48
CLERK J. Howell
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 113-195 |
| | ) | |
| OSAYBEYON ALIJUWUAPORT ENMUND | ) ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Osaybeyon Alijuwuaport Enmund, charged in a one-count indictment as a felon in possession of a firearm, moves to suppress the weapon and all other evidence seized as a result of the search of his vehicle on June 7, 2013. (Doc. nos. 13, 25.) The Court held an evidentiary hearing on December 5, 2013, and heard testimony from Narcotics Investigators Jason Kennedy and Jose Ortiz with the Richmond County Sheriff's Office ("RCSO"), Deputy Patrick Cullinan with the RCSO, and Defendant's girlfriend, Ms. Desiree Hansen. Having considered the arguments made by the parties, both oral and written, along with the hearing testimony, for the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that Defendant's motions to suppress be **DENIED**.

I. **FACTS**

In support of his request for suppression, Defendant contends that probable cause for the initial traffic stop was fabricated to allow a drug detection dog to conduct an open air sniff of the vehicle, and he argues that deputies conducted an improper warrantless search of the vehicle because the dog did not alert on the vehicle. The critical factual issues in this

case are: (1) whether Defendant was in violation of Georgia traffic laws by not wearing a seatbelt at the time the traffic stop was initiated, thereby providing a sufficient basis for the traffic stop, and (2) whether the drug detection dog alerted to the presence of drugs when conducting an open air sniff of Defendant's vehicle, thereby providing a sufficient basis for a warrantless search of the vehicle. The answers to these questions depend entirely on whether one accepts as true Defendant's version of the facts or the government's version.

A.  **Government's Version of the Facts**

On June 7, 2013, Invs. Kennedy and Ortiz patrolled the Budget Inn on Broad Street in Augusta, a location known to have a constant problem with drug transactions.[1] (Court's recording system, *For the Record*, (hereinafter "FTR") 10:47.20-.30.) They worked in an unmarked Dodge charger and were "shadowed" by Dep. Cullinan, who worked in an unmarked Ford Explorer with his canine partner, Blecky.[2] (FTR 10:47.45-:48.06.) As Invs. Kennedy and Ortiz drove into the parking lot at the Budget Inn at approximately 2:30 p.m., they observed Defendant quickly exiting a first floor motel room and entering the open, driver's side of a running Pontiac Grand Am parked in the middle of the parking lot; there was also a front-seat passenger waiting in the vehicle. (FTR 10:48.25-.51.) Based on their

---

[1] Invs. Kennedy and Ortiz each have approximately nine years of experience with the RCSO. (FTR 10:46.04-.09; 11:49.03-.08.) Inv. Kennedy has worked as a narcotics investigator for approximately four years, and Inv. Ortiz has done so for more than one year. (FTR 10:45.42-.50; 11:49.09-.13.)

[2] Dep. Cullinan, a deputy with ten years of experience with the RCSO, explained that he often "shadows" narcotics officers by staying in the general vicinity of the narcotics patrols so that he is readily available should the services of his canine partner Blecky be needed to conduct a free air sniff. (FTR 11:22.16-:25.07.) Blecky is certified annually through the United States Police Canine Association and is certified to alert on marijuana, crack and powder cocaine, heroin, and methamphetamine. (FTR 11:23.09-:24.02.)

experience as trained narcotics investigators, they found this behavior to be consistent with a drug transaction. (FTR 10:48.53-:49.12.) When Inv. Kennedy observed that Defendant did not have on his seatbelt as he drove toward the exit of the Budget Inn parking lot, he asked by radio that Dep. Cullinan - who was in his Explorer on Broad Street, across from the Budget Inn - effectuate a traffic stop if he, too, observed that Defendant did not have on his seatbelt.[3] (FTR 10:49.15-.45; 11:07.15-:08.09.)

From his heightened vantage point in the SUV, Dep. Cullinan observed Defendant turn onto Broad Street and drive past Dep. Cullinan's vehicle while not wearing his seatbelt. (FTR 11:26.03-.36; 11:38.44-:39.45.) When Dep. Cullinan activated his blue lights to effectuate a traffic stop, he observed Defendant put on the seatbelt. (FTR 10:49.49-.53; 11:27.00-.08.) Because Invs. Kennedy and Ortiz were the deputies who had requested the traffic stop, they approached the Grand Am first, and Dep. Cullinan served as backup. (FTR 11:27.24-.50.)

When first questioned, Ms. Hansen stated that she did not have any identification, and gave a false name. (FTR 10:53.11-.28; 10:56.29.) Because she provided a false name, a records check did not reveal an outstanding warrant for Ms. Hansen from Hinesville, Georgia. (FTR 10:56.39-.41.) When investigators eventually recovered Ms. Hansen's identification from the back seat of the vehicle and conducted a records check on her correct name, the outstanding warrant was discovered. (FTR 10:56.29-.38.) However, because

---

[3] O.C.G.A. § 40-8-76.1(b) provides: "Each occupant of the front seat of a passenger vehicle shall, while such passenger vehicle is being operated on a public road, street, or highway of this state, be restrained by a seat safety belt approved under Federal Motor Vehicle Safety Standard 208."

3

Hinesville officials did not want to take custody of Ms. Hansen, Inv. Kennedy exercised his discretion not to arrest Ms. Hansen for providing false information to a law enforcement officer. (FTR 10:56.43-:57.02; 11:08.12-.26.)

Separate from the interaction with Ms. Hansen, Inv. Kennedy asked Defendant for his driver's license; Defendant was very nervous and sweating, to the point that he could not locate his identification in the front of his wallet and was breathing heavily and had visibly shaking hands. (FTR 10:51.40-:52.14; 11:53.10-.12.) When Inv. Kennedy asked Defendant if he would consent to a search of the car, Defendant declined, and the investigators asked Dep. Cullinan to have his canine partner Blecky conduct a free air sniff on the vehicle. (FTR 10:52.16-.32; 11:52.47-:53.00.) The canine sniff commenced within minutes of the vehicle being stopped for Defendant's seatbelt violation. (FTR 10:52.50-:53.00.) Blecky, a passive alert drug detection dog, sat at the rear of the car, indicating an alert for drugs. (FTR 10:52.25-.45; 11:30.29-.35.) Blecky alerted on the car before the investigators had a chance to finish running the names of Defendant and Ms. Hansen through a records check to determine if there were any outstanding warrants for either person.[4] (FTR 10:53.55-:54.17.)

Upon notification by Dep. Cullinan that the dog had alerted on the vehicle, Dep. Ortiz asked Defendant to exit the vehicle. (FTR 11:54.11-.15.) A struggle ensued during the exit and subsequent Terry-frisk of Defendant by Inv. Ortiz because Defendant attempted to reach for his pants pocket and did not follow instructions to stop doing so.[5] (FTR 11:54.17-.54.)

---

[4]Of course, the records check for Ms. Hansen was prolonged because she originally provided a false name.

[5]Under Terry v. Ohio, an officer may conduct a limited, protective search for "weapons which might be used to harm the officer or others nearby" prior to the point of

4

Inv. Kennedy assisted Inv. Ortiz in the struggle to handcuff Defendant, and after they placed Defendant in custody, Inv. Ortiz recovered the loaded weapon at issue in this case from Defendant's left pants pocket - the same pocket that he had been reaching for during the struggle with Inv. Ortiz. (FTR 10:54.29-:55.46; 11:54.55-:55.38.) The search of the vehicle revealed a marijuana blunt in the driver's side door.[6] (FTR 10:56.12-.26; 11:14.28.) Because the traffic stop resulted in a felony arrest for possession of a firearm by a felon, the investigators did not issue a citation for the seatbelt violation. (FTR 11:06.35-.44; 11:14.44-:15.28.)

### B. Defendant's Version of the Facts

Defendant's only supporting witness was his girlfriend, Ms. Hansen. Their relationship began in November 2012, shortly before Ms. Hansen reached the age of majority in December. (FTR 10:11.19-.24; 10:25.55-:26.04.) On June 6, 2013, the day before the search and seizure at issue, Ms. Hansen and Defendant traveled to Augusta from Sylvania, Georgia, so that Defendant could draw a tattoo on someone Ms. Hansen knew only as "Amp." (FTR 10:12.20; 10:33.26; 10:39.26-.37.) Defendant and Ms. Hansen checked in to the Budget Inn on June 6 and checked out the next day. (FTR 10:11.41-:13.39; 10:34.26.)

---

having probable cause for an arrest. 392 U.S. 1, 25-26 (1968).

[6]When asked whether it was unusual that Blecky had alerted at the back of the vehicle when the drugs were located at the front, Dep. Cullinan provided a thorough explanation of how odor escapes from various cracks and crevices in a car. A dog may alert as soon as it encounters an odor, which may be at the place of an escaping odor rather than at the origin of the odor. Moreover, burnt marijuana- as was present in this case- has a much stronger smell to a dog than green marijuana, which may also help explain why Blecky would have picked up a drug odor at someplace other than the odor origin. (FTR 10:46.50-:47.33.)

5

As they got in to their Pontiac Grand Am to leave, Ms. Hansen knows "for sure" that they each were wearing their seatbelts because Defendant was previously arrested for failing to wear his seatbelt and thus was vigilant in making sure that both of them wore seatbelts. (FTR 10:14.45-:15.12.)

Two minutes after they left the Budget Inn, Defendant and Ms. Hansen were pulled over by undercover police officers. (FTR 10:13.51-.57.) The undercover officers refused to tell them why they stopped the car, made derogatory racial comments about Defendant's name, and stated that a black male of Defendant's age at the Budget Inn could only be there to buy or sell drugs. (FTR 10:14.10-:15.34; 10:16.30-:17.10.) Defendant denied the officer's request for permission to search the vehicle. (FTR 10:31.40-.53.) Ms. Hansen admittedly provided a false last name to the officers because she did not want to go to jail and knew that there was an outstanding warrant for her arrest for providing a false name to law enforcement during a prior traffic stop in Hinesville, Georgia. (FTR 10:29.22-:30.19; 10:40.00-.37.) Ms. Hansen testified that she gave Hinesville law enforcement officers the fake name of Ashley McKinley and was caught in her lie when she could not provide the correct address to go with that name. (FTR 10:43.33-:44.15.)

While the officers questioned Ms. Hansen, the drug detection dog walked around the vehicle. (FTR 10:18.07-:19.32.) Ms. Hansen does not believe that the dog detected any drugs because it did not bark, and the drug dogs she has seen on television bark when drugs are found. (FTR 10:18.45-:19.08; 10:31.07-.30.)[7] After the dog walked around the vehicle,

---

[7]Ms. Hansen also testified that she heard the investigators on the scene making fun of the drug detection dog much later than the time the dog sniffed the car, she presumed because the dog did not alert to the marijuana. (FTR 10:31.30-.40.) Dep. Cullinan testified,

6

the investigators pulled Defendant out of the vehicle, choked him, and otherwise used excessive force to arrest him, even though he was not resisting; the officers then commenced with the search of the vehicle. (FTR 10:19.35-:20.37.)

Ms. Hansen maintains that the officers found the weapon for which Defendant is charged with possession under the front passenger's seat in the vehicle, not in Defendant's pants pocket. (FTR 10:20.55-.56; 10:21.17-.19.) Ms. Hansen told the officers that the weapon, along with the marijuana blunt she assumes was found in the front console of the vehicle, belonged to her.[8] (FTR 10:30.22-.53;10:38.13-.24.) Ms. Hansen claims she was already in possession of the weapon when her relationship started with Defendant in November 2012, contending that Lorenzo Davis, a former boyfriend, had given it to her to hold while he was abroad in Germany for military service. (FTR 10:23.30-:24.16.) Ms. Hansen testified that Mr. Davis was in the military (perhaps the army), but she could not say for sure which branch because "they were not talking that long." (FTR 10:23.25-:24.11.) After Mr. Davis gave her the gun to hold, Ms. Hansen discovered that he was married and terminated the relationship. (FTR 10:23.33-.46.) Although Ms. Hansen professed not to have spoken to Mr. Davis since they ended their relationship and not to have any knowledge about to whom the weapon is registered, (FTR 10:24.25-.30), she kept the weapon

---

in contrast, that the investigators were joking about the dog not joining in the struggle that occurred when Defendant resisted investigators when exiting the Grand Am. (FTR 11:32.51-:33.22.)

[8]Ms. Hansen assumes that the marijuana was found in the console because that is where she put it. She maintains that it could not have been found anywhere else because Defendant was compliant with the term of his probation that he not smoke, so he would not have had any reason to remove it from where Ms. Hansen put it. (FTR 10:30.23-.52.)

7

throughout her relationship with Defendant, (FTR 10:21.29-.35).

Because she knew that Defendant was a convicted felon and could not be in possession of a weapon, Ms. Hansen kept the weapon hidden in her luggage throughout her months of living with Defendant so that he would not know about it. (FTR 10:22.00-.10; 10:32.24-.44.) Yet on the day of the search, Ms. Hansen had removed the weapon from the luggage, wrapped it in a shirt, and hidden it under the passenger's seat in the Grand Am. (FTR 10:34.31-:35.05.) She intended to eventually deliver the weapon to her grandmother in Florida. (FTR 10:21.18-.52.)

Ms. Hansen acknowledged that she cares about Defendant and does not want anything bad to happen to him. (FTR 10:37.46-.59.) She understood that if she claimed the weapon, Defendant would not get in trouble. (FTR 10:38.27-.48.)

## II. DISCUSSION

### A. Ms. Hansen Is Not a Credible Witness.

As the Court explained *supra*, the suppression issue hinges entirely on the resolution of two basic factual issues: Was Defendant wearing a seatbelt when Dep. Cullinan initiated the traffic stop on Broad Street, and did the drug detection dog Blecky alert on the vehicle when conducting a free air sniff? Defendant stakes his arguments exclusively to the testimony of one witness, his admittedly biased girlfriend who has a history of providing false information to law enforcement officers. The Court finds that Ms. Hansen is not a credible witness and instead credits the testimony of the three law enforcement officers.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing

8

court to assess the credibility of witnesses." United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citation omitted).

Here, the Court credits the testimony of Invs. Kennedy and Ortiz and Dep. Cullinan. First, even as the Rule of Sequestration was in place during the hearing, their testimony was consistent and remained so during cross-examination, with only slight differences on immaterial facts concerning things such as the location of Ms. Hansen during various portions of the traffic stop. Second, their testimony was internally consistent and logically sound.[9] Invs. Kennedy and Ortiz each described how they identified Defendant's actions as classic indications of drug activity and how they worked in tandem with Dep. Cullinan to determine whether there was a valid reason for effectuating a traffic stop. Dep. Cullinan also described his canine Blecky's training and passive alert style, which explained why Ms.

---

[9]Defense counsel's attempt to discredit Inv. Kennedy by pointing out the typographical error in his written report (doc. no. 25, Ex. 1) concerning the date Defendant was stopped and searched is but a red herring. First, inconsistencies in an incident report are not necessarily fatal to an officer's credibility with respect to his testimony regarding the events summarized in the report. Cf. United States v. Smith, 688 F.3d 730, 734 n.10 (11th Cir. 2012) (noting that the omission of details in incident report is not sufficient to render an officers' testimony facially implausible). Importantly here, the issue is a typographical error, not an omission or misrepresentation of a critical fact. Second, there is no question as to when the events actually occurred, and the other related paperwork states the correct date of June 7, 2013.

Hansen mistakenly believed the dog did not alert because she did not hear a bark.

Ms. Hansen's testimony, on the other hand, was wholly unbelievable. First, her interest in providing favorable testimony for Defendant is obvious in that she is his girlfriend, had been living with Defendant, and conceded that she did not want Defendant to get in trouble. Nor can the Court ignore Ms. Hansen's demeanor on the stand: often petulant and dismissive when pressed to explain her prior run-ins with the law and inconsistencies in her testimony or confronted with potentially damaging information about Defendant.

Second, Ms. Hansen unhesitantly admitted that she has twice broken the law by providing false information to law enforcement officers about her identity during traffic stops, including the traffic stop at issue here, and furthermore that on both occasions she only provided the correct information when law enforcement determined that the identity she initially gave was false. Her claim that she understands the wrongfulness of providing false information to avoid unpleasant consequences and is *now* providing wholly truthful information simply rings hollow.

Third, Ms. Hansen's testimony was illogical in several respects. She maintains that despite knowing Defendant could not be around guns and otherwise keeping the weapon consistently secreted in her luggage for months, on the day of the traffic stop she just happened to have the gun wrapped in a shirt and shoved under the passenger seat rather than in her luggage located in the back seat of the vehicle. Nor did she offer any plausible reason for keeping a weapon for months, given to her for safekeeping by a married ex-boyfriend with whom she had not spoken after their breakup, particularly when she claimed no knowledge (other than a general description) of the type of gun or its registration status. Just

as Ms. Hansen knew Defendant could not be around weapons, she also knew that he could not be around drugs; yet she asserts that she alone smoked marijuana and then stashed the blunt in the car in which she and Defendant were taking a road trip.

Fourth, Ms. Hansen's testimony that the drug detection dog Blecky did not alert on the car because it did not bark was based only on what she had seen on television. However, because Blecky uses a passive alert style, as described above, the fact that Ms. Hansen did not hear any barking is entirely irrelevant. In sum, Ms. Hansen is simply not a credible witness. When the Court excludes her incredible testimony, it is abundantly clear that the facts provided ample justification for the traffic stop and vehicle search.

### B. There Was Reasonable Suspicion of a Seatbelt Violation that Justified the Traffic Stop.

"The Fourth Amendment protects individuals from unreasonable search and seizure." United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003); see U.S. Const. amend. IV. A traffic stop "is a seizure within the meaning of the Fourth Amendment," United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001), but such a stop "is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889." United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (*per curiam*) (citing Chanthasouxat, 342 F.3d at 1275). When the Court determines whether probable cause existed "to believe a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.' " Id. at 1337 (citing United States v. Simmons, 172 F.3d 775,

11

778 (11th Cir. 1999)). As the Supreme Court has made abundantly clear, where there is probable cause to believe a traffic offense has occurred, the officer's subjective intent when initiating the stop is irrelevant to the Fourth Amendment inquiry. See Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id.)

Defendant first contends that probable cause for the initial traffic stop was fabricated to allow Blecky, the drug detection dog, to conduct an open air sniff of the vehicle. Under Georgia law, occupants of the front seat of a passenger vehicle must wear a seat belt. O.C.G.A. § 40-8-76.1(b). A traffic stop may be initiated if an officer has a "clear and unobstructed view of a person not restrained." Davis v. State, 733 S.E.2d 453, 455 (Ga. App. 2012); Horne v. State, 733 S.E.2d 487, 494 (Ga. App. 2012) ("[W]hen the officer observed [the defendant's] seatbelt traffic violation, he was authorized to initiate a traffic stop."); O.C.G.A. § 40-8-76.1(f). Then, an officer is "authorized to make a reasonable inquiry and investigation following the initial stop." Horne, 733 S.E.2d at 494.

Here, the only credible evidence of record is that Dep. Cullinan observed Defendant not wearing his seatbelt in the front seat of a vehicle on a public road. Inv. Kennedy first observed Defendant on private property not wearing a seatbelt and asked Dep. Cullinan to check once Defendant turned onto Broad Street. From his vantage point in an SUV, Dep. Cullinan saw that Defendant was not wearing his seatbelt as he passed by, and Dep. Cullinan observed Defendant putting on his seatbelt when Dep. Cullinan activated his blue lights. Ms. Hansen's testimony to the contrary is not to be believed.

Defendant argues that the officers had an ulterior motive for stopping the vehicle

because they wanted to conduct a free air sniff for drugs, but the Supreme Court's decision in Whren, "conclusively refutes the notion that ulterior motives may invalidate police conduct that is justified on the basis of probable cause to believe that a violation of law has occurred." United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (*per curiam*) (citing Whren, 517 U.S. at 811). Once Dep. Cullinan observed Defendant on Broad Street without his seatbelt, the deputy had probable cause to believe that Defendant violated O.C.G.A. § 40-8-76.1(b). Therefore, the subsequent traffic stop was justified. See Harris, 526 F.3d at 1337.

### C. The Investigators Had Probable Cause to Search Defendant's Vehicle.

Defendant next contends that an improper warrantless search of the Grand Am occurred because the drug detection dog did not alert on the vehicle, and therefore, no probable cause existed to search the vehicle. The Court finds no merit in this argument.

"[A] drug sniff performed during a lawful traffic stop is not a search implicating Fourth Amendment concerns." United States v. Tamari, 454 F.3d 1259, 1265 n.6 (11th Cir. 2006) (citing Illinois v. Caballes, 543 U.S. 405, 410 (2005)). Thus, once a defendant is legally stopped, as Defendant was here, conducting a canine sniff is not considered a "search" for constitutional purposes and may be done without any particularized suspicion. Caballes, 543 U.S. at 409-10; United States v. Place, 462 U.S. 696, 707 (1983). If a trained, drug-detection dog alerts on a vehicle during the sniff, then law enforcement officers have probable cause and can conduct a warrantless search of the vehicle. Tamari, 454 F.3d at 1265 (quoting United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (*per curiam*)); see also United States v. Wilbur, 458 F. App'x 829, 830 (11th Cir. 2012) (*per curiam*) ("The

drug dog alerted to the presence of drugs in [defendant's] vehicle, which gave the officers probable cause to search the vehicle without a warrant[.]"); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (*per curiam*) (citing Banks for proposition that positive responses by drug dog establishes probable cause for search).

Here, the credible evidence of record shows that Blecky, a trained drug-detection dog with a passive alert style, alerted by sitting at the back of the Grand Am. Dep. Cullinan thoroughly explained Blecky's training and alert style and confirmed that Blecky *had* alerted by sitting at the back of the car. At that point, the investigators had probable cause to search the Grand Am, regardless of whether Defendant gave or withheld his consent to search. As Defendant's argument that the investigators conducted an improper warrantless search of the Grand Am hinges on the false proposition that the dog did not alert, his argument for suppression fails.

### D. The Scope and Duration of the Traffic Stop Was Reasonable.

The Court will also briefly address one other argument raised in passing in Defendant's briefing on the particularized motion but not otherwise pursued at the hearing. In his motion, Defendant suggests that the investigators may have unlawfully extended the traffic stop to "fish for articulable suspicion of criminal activity." (Doc. no. 25, p. 5.) The hearing testimony and arguments focused primarily on whether Defendant had violated Georgia's seatbelt law and whether the drug detection dog Blecky alerted on the vehicle. There was no testimony to suggest that the stop was prolonged to allow the sniff by Blecky. Nevertheless, in the interest of covering every possible argument, the Court will briefly address the scope and duration issue.

A routine traffic stop is more analogous to an investigative detention than a custodial arrest, and therefore the legality of such a stop is analyzed under Terry v. Ohio, 392 U.S. 1 (1968). See United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). Thus, an "officer's actions during a traffic stop must be 'reasonably related in *scope* to the circumstances which justified the interference in the first place,' " and, "the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." Id. Officers may do things like investigate the driver's licence and car registration, as well as request consent to search the car. See United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999). Stated otherwise, a traffic stop may not last "any longer than necessary to process the traffic violation" unless there is articulable suspicion of other illegal activity. United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (*per curiam*).

Notably, however, the Supreme Court has specifically refused to set a *per se* time limit on Terry stops, and instead requires an examination of whether law enforcement officials diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. United States v. Place, 462 U.S. 696, 709 n.10 (1983); United States v. Sharpe, 470 U.S. 675, 686 (1985). Using this case by case approach, the courts have allowed Terry-stops to last as long as seventy-five minutes. See United States v. Gil, 204 F.3d 1347, 1350-51 (11th Cir. 2000) (*per curiam*); see also United States v. Cooper, 873 F.2d 269, 275 (11th Cir. 1989) (*per curiam*) (affirming a thirty-five minute reasonable suspicion detention).

Here, upon stopping the vehicle, the investigators had to address both Defendant and

15

Ms. Hansen. Defendant's visible nervousness hindered his ability to produce identification (Inv. Kennedy had to point it out at the front of Defendant's wallet), and Ms. Hansen's provision of a false name and lying about whether she had any identification also delayed progression of conducting a records check. More importantly, there was no delay at all in conducting the canine sniff because Blecky was onsite at the time Dep. Cullinan initiated the valid traffic stop for a seatbelt violation, conducted his sniff immediately upon request, and alerted on the vehicle within minutes - even before completion of the records checks of the vehicle's occupants. Accordingly, there is simply nothing in the record to support Defendant's conclusory contention in the briefing that the duration or the scope of traffic stop was impermissibly expanded.[10]

### III. CONCLUSION

In sum, the Court finds that Dep. Cullinan observed a traffic violation that justified a traffic stop when Defendant turned onto Broad Street and drove past Dep. Cullinan's vehicle while not wearing his seatbelt. Within minutes, the drug detection dog Blecky conducted a free air sniff and alerted on Defendant's vehicle, providing the investigators with probable cause to conduct a warrantless search of the vehicle. Defendant was ordered to exit the vehicle, and he struggled with investigators when he continued to reach for his pockets when directed not to do so. Upon taking Defendant into custody, a loaded, 9mm weapon was

---

[10]To the extent Defendant questioned in his preliminary motion (doc. no. 13, p. 2) whether he had been properly advised of his rights under Miranda v. United States, 384 U.S. 436 (1966), that issue was never developed with evidentiary support or legal argument in his particularized motion or at the hearing. None of the elements of Miranda were argued, and Defendant's request for suppression of evidence failed to identify any particular statement that was supposedly obtained improperly, let alone why there may have been a Miranda violation. Thus, any Miranda argument has been abandoned.

discovered in the pants pocket that Defendant had been reaching for when directed to exit the vehicle. Consistent with Blecky's alert, marijuana was also located in the driver's side door of the vehicle. Because the traffic stop and subsequent search comported with the requirements of the Fourth Amendment, the Court **REPORTS** and **RECOMMENDS** that the motions to suppress be **DENIED**. (Doc. nos. 13, 25.)

SO REPORTED and RECOMMENDED this 6th day of January, 2014, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE